32-08/GMV/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 8675)

**08 CV 02798**

R E C E I V E D
MAR 17 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

WAKOH MARINE S.A.,

                          Plaintiff,

    -against-

UNITED JAPAN CORPORATION,

                          Defendant.
-----------------------------------------------------------x

**08 Civ.**

**<u>VERIFIED COMPLAINT</u>**

Plaintiff, WAKOH MARINE S.A. (hereinafter "WAKOH") for its Verified Complaint

against Defendant UNITED JAPAN CORPORATION (hereinafter "UNITED JAPAN"), alleges

upon information and belief as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331. Federal jurisdiction also exists because the action arises under the New York Convention

on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or

the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

NYDOCS1/298015.1

2.      At all times material hereto, Plaintiff WAKOH was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Beatriz M. de Cabel Street, P.H. Proconsa II Building, 8th floor, Panama, Republic of Panama.

3.      At all times relevant hereto, Defendant UNITED JAPAN was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Shinbashi Yoshiki Building, 3rd floor, 4-27-4, Shinbashi, Minato-Ku, Tokyo 104-0004 Japan.

4.      On or about September 21, 2006, Plaintiff WAKOH, in the capacity as owner of the M/V TERSO, entered into a maritime contract of charter party with Defendant UNITED JAPAN, as charterer, for the chartering of the vessel for a period of at least 12 months plus or minus 60 days at the charterer's option. A copy of the charter party is annexed as Exhibit A.

5.      The vessel was duly delivered into service under the charter and performance was commenced.

6.      In accordance with the charterer's instructions, the vessel sailed to Tokyo.

7.      In December 2006, while the vessel was in Tokyo, UNITED JAPAN subsequently cancelled the charter party contract and re-delivered the vessel prematurely and without justification, which actions constituted a breach of the charter.

8.      Plaintiff subsequently accepted UNITED JAPAN's repudiation of the contract, and immediately set about to mitigate damages by seeking equivalent substitute performance at Mahe, Seychelles, which is Plaintiff's regional base for arranging employment and/or chartering of its vessels for the carriage of tuna fish.

9.      Despite diligent efforts, Plaintiff was unable to find substitute employment for the vessel until March 28, 2007, when it entered into another charter party at a lower hire rate than would have been earned under the charter party with UNITED JAPAN.

10.    Had UNITED JAPAN performed its charter party obligations, WAKOH would have earned net charter hire in the amount of $1,180,998.73. On the substitute charter party, WAKON earned only $802,917.95, resulting in a net loss of income of $378,080.78.

11.    The breach, as aforesaid, caused Plaintiff damages which, as nearly as can be computed, total $615,619.51 as follows:

| | | |
|---|---|---|
| (a) | Port expenses incurred in Tokyo following the breach | $ 1,602.36 |
| (b) | Bunker consumption for the voyage from Tokyo, Japan to Seychelles to pick up alternative employment | $ 81,973.32 |
| (c) | Bunker consumption during vessel's stay at Seychelles while awaiting alternative employment | $126,073.90 |
| (d) | Loss of earnings due to premature re-delivery/cancellation | $378,080.78 |
| (e) | Port expenses incurred at Seychelles while awaiting alternative Employment | $ 27,889.15 |

12.    Despite due demand, UNITED JAPAN has refused and/or otherwise failed to pay these amounts and after taking into consideration credits owed to UNITED JAPAN, a balance of $456,334.89 remains due and outstanding.

13.    The charter party provides for any dispute arising from the charter party with UNITED JAPAN to be submitted to arbitration at the Japan Shipping Exchange, Inc. where arbitration has already been commenced and Japanese law is to be applied. Plaintiff WAKOH specifically reserves its right to proceed in arbitration.

14.    This action is brought to obtain security in favor of Plaintiff WAKOH in respect to its claims against UNITED JAPAN and in aid of the Japanese arbitration proceedings.

15.    This action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated costs of the Japanese arbitration and interest, all of which are recoverable as part of Plaintiff's claim under Japanese law.

16.    Under Japanese law, including but not limited to the Rules of Arbitration of Tokyo Maritime Arbitration Commission of the Japanese Shipping Exchange, Inc. costs including arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiff's claim.

17.    Plaintiff has already incurred expenses for prosecuting the claim in Japan in the amount of approximately $10,000 and estimates, as nearly as can be computed, that the additional costs for prosecuting the claim in Japan will total an additional $15,000 and interest on its damages are estimated to be $63,886.88 (calculated at the rate of 7% for a period of two years, the estimated time for completion of the proceedings in Japan).

### Request for Rule B Relief

18.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

19.    The total amount to be attached pursuant to the calculations set forth above is $545,221.77.

WHEREFORE, Plaintiff WAKOH MARINE, S.A. prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$545,221.77** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its name or as may be held, received or transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any award entered against the Defendant in the Japanese proceedings; and

d.    For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       March 17, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff

By: _____
    Gina M. Venezia (GV 1551)
    Pamela L. Schultz (PS 8675)
    80 Pine Street
    New York, NY 10005
    (212) 425-1900

## ATTORNEY VERIFICATION

State of New York   )
                        ) ss.:
County of New York  )

I, GINA M. VENEZIA, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
GINA M. VENEZIA

Sworn to before me this
_1 7_ day of March 2008.

_____
Notary Public ROBERT G. RIDENOUR, JR.
Notary Public, State of New York
No. 01RI5008838
Qualified in Richmond County
Commission Expires March 1, 2011

Issued by
the Documentary Committee of the Chamber
of Shipping of the United Kingdom and
and the Documentary Committee of The Japan
Shipping Exchange, Inc.

Amended 1/1/1952
Amended 1/1/1953
Amended 1/1/1959
Amended 1/1/1952
Amended 1/1/1974

| | |
|---|---|
| **1. Shipbroker**<br><br>**BRIX REEFERS, LTD.** | **THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE**<br>**UNIFORM TIME-CHARTER (Box Layout 1974)**<br>**CODE NAME: "BALTIME 1939"**<br><br>PART I |
| | **2. Place and date**<br>Piraeus, 21st September, 2006 |
| **3. Owners/Place of business**<br><br>WAKOH MARINE S.A., PANAMA | **4. Charterers/Place of business**<br><br>UNITED JAPAN CORPORATION, TOKYO, JAPAN |
| **5. Vessel's name**<br>M.V."MUSASHI 3" T.B.R. M.V."TERSO" | **6. GRT/NRT**<br>4,491 / 2,125 |
| **7. Class**<br>NKK | **8. Indicated horse power** |
| **9. Total tons d.w. (abt.) on Board of Trade summer freeboard**<br>5,103 MT | **10. Cubic feet grain/bale capacity** |
| **11. Permanent bunkers (abt.)** | 202,637 CBFT |
| **12. Speed capability in knots (abt.) on a consumption in tons (abt.) of**<br>See Cl.26 | |
| **13. Present position** | |
| **14. Period of hire (Cl. 1)**<br>12 calendar months plus/minus upto 60 days at Charterers option | **15. Port of delivery (Cl. 1)**<br>1 GSP Mediterranean Sea not west of Malta |
| | **16. Time of delivery (Cl. 1)**<br>20th October, 2006 |
| **17. (a) Trade limits (Cl. 2)**<br>See Cl.64 | |
| **(b) Cargo exclusions specially agreed** | |
| **18. Bunkers on re-delivery (state min. and max. quantity).(Cl. 5)**<br>See Cl.71 | |
| **19. Charter hire (Cl. 6)**<br>Japanese Yen 18.1 Million (18,100,000) per calendar month | **20. Hire payment (state currency, method and place of payment; also beneficiary and bank account) (Cl. 6)**<br>ABN AMRO BANK<br>93,AKTI MIAOULI STR.,PIRAEUS BRANCH<br>SWIFT: ABNAGRAP<br>BENEFICIARY: SEAFREEZERS S.A.<br>ACCOUNT NO.: 095/000623 059 JPY<br>REFERENCE:                    TERSO /UNITED JAPAN<br>IBAN NO.: GR 55 0601 0950 0000 0000 0623 059 |
| **21. Place or range of re-delivery (Cl. 7)**<br>DLOP 1 SP Japan-Singapore range or Indian Ocean or full Med or North Europe (Gibraltar-Skaw range) or West Africa at Charterers option | **22. War (only to be filled in if Section (Q) agreed) (Cl. 21)**<br>CORRESPONDING BANK:<br>ABN AMRO BANK – TOKYO<br>SWIFT CODE: ABNAJPJT |
| **23. Cancelling date (Cl. 22)**<br>30th October, 2006 | **24. Place of arbitration (only to be filled in if place other than London agreed) (Cl. 23)**<br>THE JAPAN SHIPPING EXCHANGE INC.,TOKYO |
| **25. Brokerage commission and to whom payable (Cl. 25)**<br>8.00% total commission | **26. Numbers of additional clauses covering special provisions, if agreed**<br>Rider Cl. from 26 to 80 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

Copyright, published by The Baltic and International Maritime Conference, Copenhagen

| **Signature (Owners)** | **Signature (Charterers)** |
|---|---|
| | |

Printed and sold by S. Straker & Sons Ltd., 49, Fenchurch Street, London EC3M 3JY
by authority of The Baltic and International Maritime Conference, Copenhagen.



EXHIBIT

A

## PART II
## "BALTIME 1939" Uniform Time-Charter (Box Layout 1974)

It is agreed between the party mentioned in Box 3 as Owners of the Vessel named in Box 5 of the gross/net Register tonnage indicated in Box 6, classed as stated in Box 7 and of indicated horse power as stated in Box 8, carrying about the number of tons deadweight indicated in Box 9 on Board of Trade summer freeboard inclusive of bunkers, stores, provisions and boiler water, having as her builder's plan a cubic-feet grain/bale capacity as stated in Box 10, exclusive of permanent bunkers, which contain about the number of tons stated in Box 11, and fully loaded capable of steaming about the number of knots indicated in Box 12 in good weather and smooth water on a consumption of about the number of tons bunkers, as stated in Box 13 and the party mentioned as Charterers in Box 4, as follows:

**1. Period-Port of Delivery/Time of Delivery**
The Owners let, and the Charterers hire the Vessel for a period of the number of calendar months indicated in Box 14 from the time (not a Sunday or a legal Holiday unless taken over) the Vessel is delivered and placed at the disposal of the Charterers between 9 a.m. and 6 p.m., or between 9 a.m. and 2 p.m. if on Saturday, at the port stated in Box 15 in such available berth where she can safely lie always afloat, as the Charterers may direct, she being in every way fitted for ordinary cargo service.
The Vessel to be delivered at the time indicated in Box 16.

**2. Trade**
The Vessel to be employed in lawful trades for the carriage of lawful merchandise only between good and safe ports or places where she can safely lie always afloat within the limits stated in Box 17.
No live stock nor injurious, inflammable or dangerous goods (such as acids, explosives, calcium carbide, ferro silicon, naphtha, motor spirit, tar, or any of their products) to be shipped.

**3. Owners to Provide**
The Owners to provide and pay for all provisions and wages, for insurance of the Vessel, for all deck and engine-room stores and maintain her in a thoroughly efficient state in hull and machinery during service.
The Owners to provide one winchman per hatch. If further winchmen are required, or if the winchmen cease refuse or are not permitted to work with the Crew, the Charterers to provide and pay qualified shore-winchmen.

**4. Charterers to Provide**
The Charterers to provide and pay for all coals, including galley coal, oil-fuel, water for boilers, port charges, pilotages (whether compulsory or not), canal steersmen, boatage, lights, tug-assistance, consular charges (except those pertaining to the Master, Officers and Crew), canal, dock and other dues and charges, including any foreign general municipality or state taxes, also all dock, harbour and tonnage dues at the ports of delivery and re-delivery (unless incurred through cargo carried before delivery or after re-delivery), agencies, commissions, also to arrange and pay for loading, trimming, stowing (including dunnage) and shifting boards, excepting any already on board, unloading, weighing, tallying and delivery of cargoes, surveys on hatches, meals supplied to officials and men in their service and all other charges and expenses whatsoever including lighterage and expenses through quarantine (including cost of fumigation and disinfection).
All ropes, slings and special runners actually used for loading and discharging and any special gear, including special ropes, hawsers and chains required by the custom of the port for mooring to be for the Charterers' account. The Vessel to be fitted with winches, derricks, wheels and ordinary runners capable of handling lifts up to tons **in union purchase** [3]

**5. Bunkers**
The Charterers at port of delivery and the Owners at port of re-delivery to take over and pay for all coal or oil-fuel remaining in the Vessel's bunkers at current price at the respective ports. The Vessel to be re-delivered with not less than the number of tons and not exceeding the number of tons of coal or oil-fuel in the Vessel's bunkers stated in Box 18.

**6. Hire**
The Charterers to pay as hire the rate stated in Box 19 per 30 days, commencing in accordance with Clause 1 until her re-delivery to the Owners.
*Payment*
Payment of hire to be made in cash, in the currency stated in Box 20, without discount, every 30 days, in advance, and in the manner prescribed in Box 20.
In default of payment the Owners to have the right of withdrawing the Vessel from the service of the Charterers, without noting any protest and without interference by any court or any other formality whatsoever and without prejudice to any claim the Owners may otherwise have on the Charterers under the Charter.

**7. Re-delivery**
The Vessel to be re-delivered on the expiration of the Charter in the same good order as when delivered to the Charterers (fair wear and tear excepted) at an ice-free port in the Charterers' option as stated in Box 21, between 9 a.m. and 6 p.m., and 9 a.m. and 2 p.m. on Saturday, but the day of re-delivery shall not be a Sunday or legal Holiday.
*Notice*
The Charterers to give the Owners not less than ten days' notice at which port and on about which day the Vessel will be re-delivered.
Should the Vessel be ordered on a voyage for which the Charter period will be exceeded the Charterers to have the use of the Vessel to enable them to complete the voyage, provided it could be reasonably calculated that the voyage would allow re-delivery about the time fixed for the termination of the Charter, but for any time exceeding the termination date the Charterers to pay the market rate if higher than the rate stipulated herein.

**8. Cargo Space**
The whole reach and burthen of the Vessel, including lawful deck-capacity to be at the Charterers' disposal, reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores.

**9. Master**
The Master to prosecute all voyages with the utmost despatch and to render customary assistance with the Vessel's Crew. The Master to be under the orders of the Charterers as regards employment, agency, or other arrangements. The Charterers to indemnify the Owners against all consequences or liabilities arising from the Master, Officers or Agents signing Bills of Lading or other documents or otherwise complying with such orders, as well as from any irregularity in the Vessel's papers or for overcarrying goods, **as far as those liabilities are for Charterers matter**. The Owners not to be responsible for shortage, mixture, marks, nor for number of pieces or packages, nor for damage to or claims on cargo caused by bad stowage or otherwise. If the Charterers have reason to be dissatisfied with the conduct of the Master, Officers, or Engineers, the Owners, on receiving particulars of the complaint, promptly to investigate the matter, and, if necessary and practicable, to make a change in the appointments.

**10. Directions and Logs**
The Charterers to furnish the Master with all instructions and sailing directions and the Master and Engineer to keep full and correct logs accessible to the Charterers or their Agents.

**11. Suspension of Hire etc.**
(A) In the event of drydocking or other necessary measures to maintain the efficiency of the Vessel, deficiency of men or Owners' stores, breakdown of machinery, damage to hull or other accident, either hindering or preventing the working of the Vessel and continuing for more than **Twelve** consecutive hours, no hire to be paid **including Owners cargo indemnity ins. and war risk basic ins.** in respect of any time lost thereby during the period in which the Vessel is unable to perform the service immediately required. Any hire paid in advance to be adjusted accordingly.
(B) In the event of the Vessel being driven into Port or to anchorage through stress of weather, trading to shallow harbours or to rivers or ports with bars or suffering an accident to her cargo, any detention of the Vessel and/or expenses resulting from such detention to be for the Charterers' account even if such detention and/or expenses, or the cause by reason of which either is incurred, be due to, or be contributed to by, the negligence of the Owners' servants.

**12. Cleaning Boilers**
Cleaning of boilers whenever possible to be done during service, but if duty, on the Charterers' time **including all lub-oil** necessary time in excess of 48 hours. Should the Vessel be detained beyond 48 hours hire to cease until again ready.

**13. Responsibility and Exemption**
The Owners only to be responsible for delay in delivery of the Vessel or for delay during the currency of the Charter and for loss or damage to goods onboard, if such delay or loss has been caused by want of due diligence on the part of the Owners or their Manager in making the Vessel seaworthy and fitted for the voyage or any other personal act or omission or default of the Owners or their Manager. The Owners not to be responsible in any other case nor for damage or delay whatsoever and howsoever caused even if caused by the neglect or default of their servants. **whilst vessel is on hire** The Owners not to be liable for loss or damage arising or resulting from strikes, lock-outs or stoppage or restraint of labour (including the Master, Officers or Crew) whether partial or general.
The Charterers to be responsible for loss or damage caused to the Vessel or to the Owners by goods being loaded contrary to the terms of the Charter or by improper or careless bunkering or loading, stowing or discharging of goods or any other improper or negligent act on their part or that of their servants.

**14. Advances**
The Charterers or their Agents to advance to the Master, if required, necessary funds for ordinary disbursements for the Vessel's account at any port charging only interest at 6 per cent. p.a., **fuel oil, diesel oil** such advances to be deducted from hire.

**15. Excluded Ports**
The Vessel not to be ordered to nor bound to enter: a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel **Charterers cargo indemnity ins.**
*Ice*
b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed loading or discharging. The Vessel not to be obliged to force ice, **but Charterers to have free use of vessel gear and outfit as on board.** nor on account of ice to follow an ice-breaker. If on account of ice the Master in his discretion considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers' fresh instructions. Unforeseen detention through any of above causes to be for the Charterers' account.

**16. Loss of Vessel**
Should the Vessel be lost or missing, hire to cease from the date when she was lost. If the date of loss cannot be ascertained half hire to be paid from the date the Vessel was last reported until the calculated date of arrival at the port of destination. Any hire paid in advance to be adjusted accordingly. **calendar month**

**17. Overtime**
The Vessel to work day and night if required. The Charterers to refund the Owners their outlays for all overtime paid to Officers and Crew according to the hours and rates stated in the Vessel's Articles. **by the Charterers**

PART II
"BALTIME 1939" Uniform Time-Charter (Box Layout 1974)

**18. Lien** 258
The Owners to have a lien upon all cargoes and 259
sub-freights belonging to the Time-Charterers and 260
any Bill of Lading freight for all claims under 261
this Charter, and the Charterers to have a lien 262
on the Vessel for all moneys paid in advance 263
and not earned. 264

**19. Salvage** 265
All salvage and assistance to other vessels to be 266
for the Owners' and the Charterers' equal benefit 267
after deducting the Master's and Crew's propor- 268
tion and all legal and other expenses including 269
hire paid under the charter for time lost in the 270
salvage, also repairs of damage and coal or oil 271
fuel consumed. The Charterers to be bound by 272
all measures taken by the Owners in order to 273
secure payment of salvage and to fix its amount. 274

**20. Sublet** 275
The Charterers to have the option of subletting 276
the Vessel, giving due notice to the Owners, but 277
the original Charterers always to remain respon- 278
sible to the Owners for due performance of the 279
Charter. 280

**21. War** 281
(A) The Vessel unless the consent of the Owners 282
be first obtained not to be ordered nor continue 283
to any place or on any voyage nor be used on 284
any service which will bring her within a zone 285
which is dangerous as the result of any actual 286
or threatened act of war, war hostilities, warlike 287
operations, acts of piracy or of hostility or ma- 288
licious damage against this or any other vessel 289
or its cargo by any person, body or State what- 290
soever, revolution, civil war, civil commotion or 291
the operation of international law, nor be ex- 292
posed in any way to any risks or penalties whatso- 293
ever consequent upon the imposition of Sanc- 294
tions, nor carry any goods that may in any way 295
expose her to any risks of seizure, capture, pe- 296
nalties or any other interference of any kind 297
whatsoever by the belligerent or fighting powers 298
or parties or by any Government or Ruler. 299

(B) Should the Vessel approach or be brought or 300
ordered within such zone, or be exposed in any 301
way to the said risks, (1) the Owners to be en- 302
titled from time to time to insure their interests 303
in the Vessel and/or hire against any of the risks 304
likely to be involved thereby on such terms as 305
they shall think fit, the Charterers to make a re- 306
fund to the Owners of the premium on demand 307
and (2) notwithstanding the terms of Clause 11 308
hire to be paid for all time lost including any 309
lost owing to loss of or injury to the Master, 310
Officers, or Crew or to the action of the Crew in 311
refusing to proceed to such zone or to be ex- 312
posed to such risks. 313

~~(C) In the event at the wages of the Master, Of- 314~~
~~ficers and/or Crew or the cost of provisions and/ 315~~
~~or stores for deck and/or engine room and/or 316~~
~~insurance premiums being increased by reason 317~~
~~of or during the existence of any of the matters 318~~
~~mentioned in section (A) the payment of any in- 319~~
~~crease to be added to the hire and paid by the 320~~
~~Charterers on production of the Owners' account 321~~
~~therefor, such account being rendered monthly. 322~~

(D) The Vessel to have liberty to comply with 323
any orders or directions as to departure, arrival, 324
routes, ports of call, stoppage, destination, de- 325
livery or in any other wise whatsoever given by 326
the Government of the nation under whose flag 327
the Vessel sails or any other Government or any 328
person (or body) acting or purporting to act with 329
the authority of such Government or by any com- 330
mittee or person having under the terms of the 331
war risks insurance on the Vessel the right to 332
give any such orders or directions. 333

(E) In the event of the nation under whose flag 334
the Vessel sails becoming involved in war, hos- 335
tilities, warlike operations, revolution, or civil 336
commotion, both the Owners and the Charterers 337
may cancel the Charter and, unless otherwise 338
agreed, the Vessel to be re-delivered to the Ow- 339
ners at the port of destination or, if prevented 340
through the provisions of section (A) from reach- 341
ing or entering it, then at a near open and safe 342
port at the Owners' option, after discharge of any 343
cargo on board. 344

(F) If in compliance with the provisions of this 345
clause anything is done or is not done, such not 346
to be deemed a deviation. 347
Section (C) is optional and should be considered 348
deleted unless agreed according to Box 22. 349

**22. Cancelling** 350
Should the Vessel not be delivered by the date 351
indicated in Box 23, the Charterers to have the 352
option of cancelling. 353
If the Vessel cannot be delivered by the cancel- 354
ling date, the Charterers, if required, to declare 355
within 48 hours after receiving notice thereof 356
whether they cancel or will take delivery of the 357
Vessel. 358

**23. Arbitration** 359
~~Any dispute arising under the Charter to be re- 360~~
~~ferred to arbitration in London (or such other 361~~
~~place as may be agreed according to Box 24) 362~~
~~one Arbitrator to be nominated by the Owners 363~~
~~and the other by the Charterers, and in case the 364~~
~~Arbitrators shall not agree then to the decision 365~~
~~of an Umpire to be appointed by them, the award 366~~
~~of the Arbitrators or the Umpire to be final and 367~~
~~binding upon both parties. 368~~

**24. General Average** 369
General Average to be settled according to York/ 370
Antwerp Rules, 1974. Hire not to contribute to 371
General Average. 372

**25. Commission** 373
The Owners to pay a commission at the rate 374
stated in Box 25 to the party mentioned in Box 375
25 on any hire paid under the Charter, but in no 376
case less than is necessary to cover the actual 377
expenses of the Brokers and a reasonable fee 378
for their work. If the full hire is not paid owing 379
to breach of Charter by either of the parties the 380
party liable thereto to indemnify the Brokers 381
against their loss of commission. 382
Should the parties agree to cancel the Charter, 383
the Owners to indemnify the Brokers against any 384
loss of commission but in such case the com- 385
mission not to exceed the brokerage on one 386
year's hire. 387

RIDER TO THE CHARTER PARTY FOR

M/V "MUSASHI 3" T.B.R. M/V "TERSO" C/P DATED, PIRAEUS, 21st September, 2006


26. Description of the Vessel

As per attached.

Owners to rename vessel prior to delivery for Owners account.


27. supercargo

AA. Charterers to have the option of appointing a supercargo who shall accompany the Vessel and he is to be furnished with free accommodation and same fare as provided for Captain's table.

BB. Owners shall allow crew(s) of fishing vessel to travel on board but always within the limit of numbers of relative regulations.


Charterers shall pay to Owners amounting JP ¥ 1,000.00 per day for above AA and JP¥900.00 per person/day for above BB.


28. Gratings

AA. The Vessel to be fitted with   portable   gratings   on all   decks/tank-tops in each hold.

BB. All gratings on all decks/tank-tops are to be capable of providing support for the working of forklift trucks up to a total weight of 4.5 metric tons (inclusive weight of truck and cargo).

CC. Owners are properly and regularly to maintain and keep maintained in good condition the gratings to ensure that they comply throughout the period of this charter with the specification in BB above and to repair and/or replace any damaged gratings immediately if they fail to comply with that satisfaction.

DD. All said maintenance, repair and replacement of gratings to be for Owners' account.

EE. Without prejudice, in the generality of Clause 11 hereof, in the event that loading and/or discharging is delayed, hindered or prevented as a result of gratings not being maintained, repaired or replaced as aforesaid, then no hire to be paid in respect of any time lost thereby.   Any hire paid in advance to be adjusted accordingly.

to be continued

29. <u>Refrigeration and other equipment</u>

Refrigeration machinery, appliances and insulation which shall satisfy all Lloyd's RMC or its equivalent requirements and shall be capable of maintaining throughout any voyage simultaneously in each of the Vessel's cooling sections separate temperatures as required by the Charterers not above minus 50 degrees Celsius for carrying full cargo described in Clause 26.

30. <u>Electric Light</u>

The Vessel to supply as and when required sufficient electric light and lamps of all hatches and in all holds for night work.

31. <u>Signing Bills of Lading</u>

Charterers or their agents are authorized to sign Bills of Lading on behalf of Master of the Vessel in accordance with loading tally, mate's receipt, etc.

32. <u>Supplies</u>

Owners to furnish at their expenses the necessary supplies required to ensure satisfactory refrigeration.  Owners guarantee that the Vessel will be provided with the usual R.M. Certificate.

33. <u>Hold cleaning on Delivery/Redelivery</u>

The Vessel to be delivered with refrigerated chambers clean swept/washed and free of smell to the satisfaction of Lloyd's surveyor or equivalent and tight, staunch and in every way fitted and approved for the carriage of frozen tuna and/or other frozen fish and/or other frozen food commodities.

However, Charterers have liberty to pay JP¥55,000.<u>00</u> instead of cleaning holds prior to redelivery of the Vessel.

34. <u>Hold cleaning on Sailing</u>

Cleaning of vessel's holds such as sweeping, water cleaning and dunnage disposal in order to prepare ship for the next cargo, to be performed by vessel's crew prior to or during the ballast trip.   If cleaning is required , Charterers to pay Master with the rates mutually agreed between Charterers and Master. Crew to be considered as Charterers servants.

35. <u>Ballast</u>

Owners to guarantee that the Vessel can make ballast voyages without requiring any of ballast.

to be continued

36. Stevedore damage

Should any damage be caused to the Vessel or her fittings by Charterers or their stevedores Master is to endeavor to obtain written acknowledgement from the responsible party and have a survey to define and estimate the damage, same being free of expenses to Owners, in agreement with the ship's agents or supercargo unless the damage should have been repaired in the meantime, failing which Charterers shall not be responsible for such damage.

37. Cargo-gear

All cargo gears to be in working order before deliver of the Vessel and to be so maintained by Owners during the period of charter.   International Certificate of Efficiencies of the working equipment (register of cargo handling machinery and gear) to be on board and shown to Charterers or their agents upon their request.

38. General cargo

Charterers to have the liberty to load   lawful general cargoes in/on the Vessel.   Owners to agree to load cars without petrol and with batteries disconnected (not live).

39. Speed and bunker consumption

If during the duration of this charter, vessel's speed is reduced except in harbor, straits and/or narrow water, and/or bunker consumption is increased, the time so lost and the cost of extra bunker so consumed shall be deducted from the hire unless proved bad weather or other reasonable reasons.

40. Cargo-gear breakdown

In the event of breakdown of cargo-gears by reason of disablement or insufficient power, the hire to be reduced pro-rata for the period of such inefficiency in relation to the number of cargo-gears available.   Owners agree to pay in addition the cost of labour directly affected by the breakdown, and for hiring of shore appliances, in which case the Vessel not be off-hire for the period shore appliances are hired.

41. Stowage plan

Detailed stowage plan to be executed by the Vessel and dispatched to Charterers and/or agents prior to arrival at the first discharging port.   Owners and Master to undertake all efforts to cooperate with Charterers for the best stowage of cargo.

to be continued

### 42. Owners' agent
Owners to appoint their own agents for major repairs, dry-docking and general average. For minor Owners' matters Owners to be allowed to use Charterers' agents with paying actual expenses including husbandry agency fees.

### 43. Fumigation
Expenses in connection with fumigation and/or quarantine ordered because of cargoes carried or ports visited while the Vessel is employed under this charter to be for Charterers' account. Expenses in connection with all other fumigation and/or quarantine to be for Owners' account.

### 44. Consular charges
Charterers not to be responsible for consular charges payable to the consulates of the country of the Vessel's flag.

### 45. Default of hire payment
In default of hire payment, Owners to notify Charterers and if payment is not effected within three banking days after such notice, Owners have the right of withdrawing the Vessel from the service of Charterers without prejudice to any claim Owners may otherwise have on Charterers under this charter.

### 46. Funnel mark
Charterers to have the option of painting the Vessel's funnel with their own colors and flying their house flag during the currency of this charter. Owners to paint funnel with Charterers' color upon request by Charterers and Charterers shall pay amounting JP¥100,000.00 to Owners for such painting works to which allowances, paints, etc are all inclusive.

### 47. Distance thermometer and CO2 detectors
The Vessel is equipped with distance thermometer (animal and plant health inspection service) approved by United States Department of Agriculture and CO2 detectors, which to be maintained in good working order for the whole duration of this Charter Party.
The vessel has not U.S.D.A. Certificate.

### 48. Temperature instruction
Charterers to give Master written instruction with pre-cooling and/or carrying temperature required for frozen and reefer cargoes during voyage. The Vessel to maintain temperature instructed with the allowance about plus/minus half (0.5) degrees centigrade respectively.

to be continued

49. Canceling option

Charterers shall have the option of canceling this Charter Party in the event of outbreak of war or warlike hostilities between any two or more of the following countries.

United States of America
United Kingdom
Japan
France
C.I.S.
People's Republic of China

50. Regulations and certificates

It is understood that the Vessel's all equipment meet with the Australian New Zealand, Canadian, U.S.C.G. and other regulation requirement, especially meet with the requirement of W.W.F. of Australian and New Zealand.   Otherwise any time lost to confirm to the above regulations not to count against hire, and any expenses arising from the same reason to be for Owners' account.   The Vessel always have necessary certificates on board.

51. Financial responsibility for oil pollution

Owners undertake that the Vessel is furnished with a certificate of evidence of financial responsibility issued by U.S. Coast Guard under 33 CFR 138 under section 1002 of "The Oil Pollution Act of 1990" and under section 107 of "The Comprehensive Environmental Response, Compensation and Liability Act" and amendments thereto.

52. Deratization

Owners to supply valid Deratization Certificate and Certificate of Inspection for Radio Platique at their expenses during the entire duration of Charter Party.

53. Arrest

Should the Vessel be arrested during the currency of this Charter Party at the suit of any person having or purporting to have a claim against or any interest in the Vessel, hire under this Charter Party shall not be payable in respect of any period whilst the Vessel remains under arrest or remains unemployed as the result of such arrest, and Owners shall reimburse to Charterers any expenditure which they may incur under this Charter Party in respect of any period during which by virtue of the operation of this clause.   This clause is inoperable should the arrest be caused by any act or omission of Charterers or their agents.

to be continued

### 54. Capture

No hire shall be payable for the delay caused by the Vessel being captured, seized, arrested or detained in any other way whatsoever by any person, party, organization, or government in pursuance or in consequence of any interest in or claim or complaint against of dispute with the Vessel or her Owners or the government of the nation under whose flag the Vessel is sailing.   This clause is inoperable, should such capture, seizure, arrest or detention be caused by any act or omission of Charterers or their agents.

### 55. Hire deduction

Charterers shall have the liberty to deduct any agreed off-hire period, any amount disbursed for Owners' account from the hire payment, supported by vouchers.   Charterers have the further liberty to deduct the estimated amount of disbursements for Owners' account outstanding for which vouchers have not yet reached to Charterers, and any agreed off-hire period in accordance with terms and conditions of this Charter Party from the final payment.

### 56. Off-hire

In the event of any loss of time from deficiency of men, including strikes of officers and crew, or stores, fire, breakdown or damage to hull, machinery and/or reefer installations, cargo-gears, or derricks or equipment, grounding, detention by average accidents to the Vessel or cargo, dry-docking for the purpose of examining or painting bottom, or by any other cause preventing the full working of the Vessel, the payment of the hire shall cease of the time thereby lost and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost and the cost of any extra fuel consumed in consequence thereof shall be deducted from the hire.

### 57. Owners' responsibility

Owners to be fully responsible for the navigation of the Vessel.   Charterers not be responsible for losses sustained by the Vessel on account of negligence of pilots, tugboats, she shall be fully deemed the servants of Owners and under their instructions.

### 58. Deviation, Sickness or Accident

If during the currency of this Charter, there is any deviation during the course of the voyage or any loss of time whatsoever, caused by sickness or by accident to crew or any person on board the Vessel (other than passengers or supercargoes traveling under Charterers' auspice), hire shall not be paid for the time so lost and the cost of extra fuel consumed and any other extra expenses incured shall be for Owners' account.

to be continued

59. Watchmen

Expenses for watchmen (gangway, etc.) ordered by Master to be for Owners' account.


60. Boatage

Owners to pay for boatage when launch is used solely for the Vessel's officers and crew.


61. Crew's cargo handling works

Charterers to be rendered following customary assistance for cargo handling works from the Vessel's crew within hire;

AA. Hatch opening and closing for loading and discharging if local stevedore regulations permissible.

BB. Raising and lowering derricks in preparation for loading and discharging cargoes if allowed by local regulations.

CC. Supervisory of loading and discharging operation also supervisory of lashings and dunnage and adjustment of same during voyage if found necessary.


The above service shall be considered as a minimum and shall in no way be constructed as an alternative to or reduction in standard of services from officers and crew required by maritime code of the country under whose flag the Vessel sails, custom and practice of port permitting.


62. Master's self-pilotage

Master to berth/un-berth the Vessel without pilot(s) upon Charterers' request and Charterers shall pay allowance for such work directly to Master in accordance with the rates mutually agreed between Charterers and Master. But Master to have right to reject self-pilotage in restricted and un-familiar areas where the Vessel's safe navigation is paramount.


63. Transhipment clause

Charterers to have right to load and/or discharge up to full cargo on open sea by direct transshipment to/from trawlers and/or other type of vessels including factory vessels.

Should weather circumstances or heavy sea during loading operations hinder transshipment operation or endanger the safety of the Vessel, Master may in his discretion to leave the feeding vessels or in his discretion to instruct feeding vessels to leave from alongside until the weather/sea condition have improved.   In case of discharging operation, feeding vessel means receiving vessel.

to be continued

Master, officers and crew to perform following cargo handling works upon request by Charterers with compensations under the rates mutually agreed between Charterers and Master and such compensations shall be paid by Charterers directly to Master soon as arrive final discharging port.  For such works, Master and crew to be considered as Charterers' servants.

Owners to provide adequate warm clothing, footwear and gloves for crew when performing Cargo works in vessel's holds.

   AA. Loading, discharging, stowing of cargoes and/or disposition of dunnage and
        correction of slings, etc.
   BB. Lashing and securing of cargoes, except as per Clause. 61. CC.

## 64. Trade limits / I.W.L. Clause

Trading always within Institute Warrantee Limits (I.W.L) via safe ice-free berths, ports and anchorages always afloat excluding Alaska, North Korea, Cuba, Israel, Sweden, Finland, Sea of Azov, U.N. embargoed countries and war or war-like areas.

Charterers to have option to break I.W.L., Sweden and Finland subject to Owners' prior consent to which shall not be unreasonably withheld but the vessel never to force or follow ice breaker, against paying the net extra insurance premium of hull and machinery as per receipt invoice from Owners' underwriters.  Such extra insurance premium must not exceed the rates as charged by Lloyd's underwriters.

Basic war risk to be for Owners account and extra war risk to be for Charterers account.

## 65. Prohibition

It is prohibited for Vessel's crew to carry any merchandise on board and any custom fine(s) imposed on aforesaid merchandise to be for Owners' account.

## 66. Indemnity insurance

Owners confirm that the Vessel is fully insured in respect of hull and machinery and in respect of cargo indemnity.

Owners' underwriters of Hull & Machinery are "Generali, Hellenic Hull, British Syndicate, Aigaion and other markets" with its value USD 6.5 Million and P & I Club is "Gard".

Charterers confirm that they are fully insured in respect of indemnity and their underwriters are "Tokio Marine & Nichido Fire Insurance Co., Ltd".

To be continued

### 67. Deviation, Off-hire

Should the Vessel put back or deviated on a voyage by reason of an accident or breakdown, deficiency, accident or illness of crew or for the Vessel's business, the hire shall be suspended from the time of her putting back or of her deviation until she regains her former position or a position equivalent with respect to her next destination, and resumes the voyage therefrom.   All expenses during such time, including port charges, agency fees, fuel consumed and other expenses which normally would be for Charterers'   account, shall be for the account of Owners.

### 68. Provisional deduction of Owners' expenses

In case port agents have debited Charterers for expenses which fall within Owners' scope of responsibility, Charterers are entitled to make a provisional deduction of such Owners' expenses, based on the telegraphic statements from agent(s), from next hire.   Charterers are also entitled to make provisional deductions for off-hire which at the time unable to finally settled pending receipt of documents and also for planned off-hire (e.g. repairs, dry-docking) and off-charter within the forthcoming hire period.

### 69. I.T.F.

In the event of loss of time due to boycott of the Vessel by shore labour or due to government restrictions of I.T.F. recommendations all caused by the Vessel's flag or by reason of any tracing of this or any other vessel under same ownership, operation or control, payment of hire shall cease for the time thereby lost and Owners to reimburse Charterers any expenses caused thereby.

### 70. Communication entertainment

Charterers to pay Owners JP ¥ 130,000.00 per month as ship's communication and entertainment fee for which to be paid together with charter hire and this amount to be all inclusive besides extra payment as follows.

Charterers to pay Master directly amounting maximum JP¥ 35,000.00 per month for covering entertainment expenditures for shipper and/or fishing vessels.

to be continued

71. Bunkers

The Vessel to be delivered with bunkers (both I.F.O and M.D.O) as on board, Charterers to take over and pay based on Owners' net purchase prices.

The Vessel to be re-delivered with bunkers (both I.F.O. and M.D.O) as on board about same quantities as on delivery, Owners to take over and pay based on Charterers' net purchase price.

Bunker survey to be arranged by Owners on delivery and same to be arranged by Charterers on re-delivery, cost of each surveys to be equally shared by Owners and Charterers.

When bunkers to be replenished, always under the supervision and responsibility of Master. Master to pay due diligence for replenishment of bunkers in order to prevent oil spillage and/or any other accidents while bunkering.   And also Owners warrant that the Vessel is eligible for replenishing bunkers in any countries if required.   Master to take a minimum of two samples of replenished bunkers through a cock on supplying pipeline to insure against claims of contaminated fuel.   If any contamination is present, Master to notify to Charterers within one week after receipt of bunkers.

72. Arbitration

Any dispute arising from this Charter Party shall be submitted to arbitration held in Tokyo by the Japan Shipping Exchange Inc., in accordance with the provisions of the Maritime Arbitration Rules of the Japan Shipping Exchange, Inc., and the award given by the arbitrators shall be final and binding on both parties.

73. Others

This charter is subject to the following clauses all of which are to be including in all Bills of Lading issued hereunder.

Both to-blame Collision Clause
New Jason Clause
General Paramount Clause
U.S.A. Clause Paramount
Canadian Clause Paramount

to be continued

74. I.S.M. clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

75. ISPS/MTSA clause

(a) (i) the Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages expense or delay (excluding consequential loss, damages expense of delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners account, except as otherwise provided in this Charter Party.

(b) (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provide to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure

that the contact details of all sub-charterers are likewise provided to the Owners".

to be continued

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party, all delay, costs or expeses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

76. <u>AMS clause</u>

a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

   i)   Have in place a SCAC (Standard Carrier Alpha Code);
   ii)  Have in place an ICB (International Carrier Bond);
   iii) Provide the Owners with a timely confirmation of i) and ii) above; and
   iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

b) the Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the

Charterers for those amounts.

to be continued

d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

77. Charter Party
This Charter Party to be formed two originals and each one to be kept by both Owners and Charterers.

78. Direct contact with managers
Charterers have right to contact with the Managers of the Vessel directly in case of emergencies and advise/instruct them if necessary.

79. Manning
Owners to arrange manning of total 20 officers and crew (Japanese Master / Chief Officer / Chief Engineer plus 17 crew)
Crew manning company as introduced by the Charterers.

80. Confidentiality
The contents of this Charter Party shall remain private and confidential between Owners and Charterers and shall not be divulged to any of third party.

*******END*******

Both-to-Blame Collision Clause

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with laws of the United States of America, the following clause shall apply.

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Marine, Pilot or the servants of the Carrier n the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect of a collision or contract.   And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

New Jason Clause

In the event of accident, danger, damage or disaster before or after commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statue, contract, or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the Carrier in general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers.   Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the carrier before delivery.

to be continued

Canadian Clause Paramount

This Bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Carriage of Goods by Water Act, 1970, Revised Statues of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunity or an increase of any of its responsibilities or liabilities under the said Act.    If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent, but no further.

U.S.A. Clause Paramount

This Bill of Lading shall have effect to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities under said Act.    If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

General Paramount Clause

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bill of Lading contained in the International Convention, dated Brussels 25th August 1924 and any modifications thereof and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its right or immunities or an increase of any of its responsibilities or liabilities, thereunder.    If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further.    Nothing in this Bill of Lading shall operate to limit or deprive the carrier of any statutory protection or exemption from, or limitation of liability.

MV "MUSASHI 3" (to be renamed) MV "TERSO"

| | |
|---|---|
| BUILT | : 1994  KYOKUYO |
| FLAG | : PANAMA |
| CALL SIGN | : H3QV |
| CLASS | : NKK |
| OFFICIAL No | : 27692-01-C |
| PORT OF REGISTRY | : PANAMA |
| DWAT | : 5,103 MT on 6.914 m draft |
| GT/NT INTL | : 4,491 / 2,125 |
| LOA | : 120.75 mtrs |
| LBP | : 112.90 mtrs |
| BREADTH MLD | : 16.60 mtrs |
| DEPTH MLD | : 10.00 mtrs |
| DRAFT | : SUMMER: 6.914 mtrs |
| HOLDS/HATCHES | : 4/4 (Hatch Size: 4.00 m (l) x 4.00 m (b) |
| COMPARTMENTS | : 11 COMPARTMENTS |
| | Hold No.1:    A,B |
| | Hold No.2-4:  A,B,C |
| COOLING SECTIONS | : 7 COOLING SECTIONS |
| | (1AB, 2A, 2BC, 3A, 3BC, 4A, 4BC) |
| GRATINGS | : WOODEN- MAX LOAD 5 MT |
| | (CARGO + FORKLIFT WITH 4 PNEUMATIC TYRES) |
| CARGO GEAR | : 8 Derricks (SWL 5TNS EACH,  U/P 3TONS) |
| AIR FENDERS | : 4 |

CUBIC CAPACITY :  (excluding hatch coaming spaces)

| | HOLD No.1 | HOLD No.2 | HOLD No.3 | HOLD No.4 | TOTALS |
|---|---|---|---|---|---|
| A | 16,445 | 20,576 | 20,388 | 20,135 | 77,544 |
| B | 10,643 | 19,938 | 20,789 | 20,606 | 71,976 |
| C | · | 16,627 | 19,429 | 17,061 | 53,117 |
| TOTALS | 27,088 | 57,141 | 60,606 | 57,802 | 202,637 |

TOTAL:        202,637 CFt

FLOOR AREA

|   | HOLD No.1 | HOLD No.2 | HOLD No.3 | HOLD No.4 | TOTALS |
|---|-----------|-----------|-----------|-----------|--------|
| A | 169.94 | 235.58 | 240.68 | 234.11 | 880.31 |
| B | 120.25 | 232.36 | 247.22 | 242.08 | 841.91 |
| C | · | 190.14 | 233.23 | 174.86 | 598.23 |
| TOTALS | 290.19 | 658.08 | 721.13 | 651.05 | 2,320.45 |

TOTAL: 2,320.45 M2

DECK HEIGHTS:   MIN 2.2 M

CARGO HOLDS TEMPS:   - 50 DEGREES CELCIUS TO +12 DEGREES CELCIUS

SPEED / CONSUMPTION:

MAIN ENGINE
BALLAST     :   Abt 15 Knots ON ABT 16.5 Mts/Day (IFO:180 Cst)
LADEN       :   Abt 14 Knots ON ABT 16.5 Mts/Day (IFO:180 Cst)

PORT CONSUMPTION
REEFER PLANT OFF   :   Abt 2.5 Mts / Day (IFO:180 Cst)
REEFER PLANT ON    :   Abt 4.0 Mts / Day (IFO:180 Cst)

SPEEDS / CONSUMPTIONS BASIS CALM SEAS UP TO MAX BEAUFORT FORCE 2.

VSL USES MDO WHEN MANOUEVERING IN RESTRICTED WATERS
E.G. CANALS, ENTERING AND LEAVING PORT.

BUNKER GRADES TO BE SUPPLIED IN ACCORDANCE ISO 8217/2005(e)
I.E. MDO = MDB AND 180CST = RME 180), AND TO BE SUPPLIED
IN ACCORDANCE WITH MARPOL 73/78 ANNEX VI REQUIREMENTS
++++
TANK CAPACITY

FUEL OIL CAPACITY   :   985.50 cbm
DIESEL OIL CAPACITY :   388.83 cbm
END